ACCEPTED
07-15-00238-CR
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
11/10/2015 3:54:01 AM
Vivian Long, Clerk

**ORAL ARGUMENT IS NOT REQUESTED**

**NO. 07-15-00238-CR**

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS

11/10/2015 3:54:01 AM

VIVIAN LONG
CLERK

**IN THE COURT OF APPEALS**

**SEVENTH SUPREME JUDICIAL DISTRICT**

**AMARILLO, TEXAS**

**THE STATE OF TEXAS,
APPELLANT,**

**VS.**

**ROSA ELENA ARIZMENDI,
APPELLEE**

**APPELLEE'S BRIEF**

**FROM CAUSE NUMBER 68589E**

**8N THE 108TH DISTRICT COURT**

**IN AND FOR POTTER COUNTY, TEXAS**

**HONORABLE DOUGLAS R. WOODBURN, PRESIDING**

> **DIANNA L. McCOY**
> **ATTORNEY FOR APPELLEE**
> **112 S.W. 8th, Ste. 540**
> **Amarillo, Texas 79101**
> **Tel. 806-373-4025**
> **Fax 806-350-5414**
> **dianna.mccoy@gmail.com**
> **SBN 24026865**

**THE STATE OF TEXAS,
APPELLANT**

**VS.**

**ROSA ELENA ARIZMENDI,
APPELLEE**

---

**IDENTITY OF PARTIES AND COUNSEL**

---

**Appellant:**
State of Texas

**Appellee:**
Rosa Elena Arizmendi
13100 N.E. 29th
Amarillo, TX 79111

**Attorney:**
RANDALL SIMS
47th District Attorney

Richard Martindale
Assistant District Attorney
501 S. Fillmore, Ste. 5A
Amarillo, TX 79101
Tel. 806-379-2325
Fax 806-379-2823
Email richardmartindale@co.potter.tx.us
SBN 00784535

**Appellee Attorney:**
DIANNA L. McCOY
112 S.W. 8th, Ste. 540
Amarillo, TX 79101
Tel. 806-373-4025
Fax 806-350-5414
Email dianna.mccoy@gmail.com
SBN 24026865

**Trial Attorney:**
Dianna L. McCoy
112 S.W. 8th, Ste. 540
Amarillo, TX 79101
Tel. 806-373-4025
Fax 806-350-5414
Email dianna.mccoy@gmail.com
SBN 24026865

# TABLE OF CONTENTS

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ISSUE PRESENTED:

**THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY GRANTING THE MOTION FOR NEW TRIAL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3**

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      No New Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      Failure to Meet Zalman Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION AND PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# INDEX OF AUTHORITIES

## *Caselaw*

***Estrada v. State***, 149 S.W.3d 280 (Tex. App.–Houston [1ˢᵗ Dist.] 2004, pet. ref'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

***State v. Herndon***, 215 S.W.3d 901 (Tex. Crim. App. 2007). . . . . . . . . . 5-6, 13-14

***State v. Zalman,*** 400 S.W.3d 590 (Tex. Crim. App. 2013). . . . . . . . . . . . . . . . . 11

## Statues

Tex.R.App.P 21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

Tex.R.App.P. 25.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Transp. 545.058(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

## STATEMENT OF THE CASE

This is the Appellee's reply to the State's appeal from the trial court's order granting Rosa Elena Arizmendi's (hereinafter "Appellee" or "Defendant") Motion for New Trial. CR:51. Appellee was arrested on January 26, 2014, along with Jose Cortez, by Texas Department of Public Safety (hereinafter "DPS"). She was charged and subsequently indicted for the offense of Possession with Intent to Deliver a Controlled Substance, Penalty Group One, Methamphetamine, in an amount greater than four hundred grams. CR:17. *See* TEX. HEALTH & SAFETY CODE § 481.112(f).

On April 28, 2015, Appellee pleaded guilty to the charge in the indictment, and was sentenced in accordance with the plea agreement, and completed the paperwork attendant to that plea, including the waivers of rights required by Statute, and those insisted upon by the prosecution. CR: 33, 36. PRR[1] 6-11.

On May 15, 2015, Appellee filed her Motion for New Trial and Motion in Arrest of Judgment (CR: 44-49) based upon new evidence not available at the time of the plea. That new evidence was Trooper Snelgrooes' testimony during the hearing on Juan Cortez's Motion to Suppress. CR:45.

The trial court granted Appellee a hearing on her Motion for New Trial, and

---

[1] Plea Reporter's Record, 4-28-15, attached as Appendix A

1

that hearing was conducted on June 9, 2015. Appellee offered into evidence the Reporter's Record of the suppression hearing in Cortez's case[2], along with the Findings of Fact and Conclusions of Law in that case. RR:6.

On June 12, 2015, the trial court entered its Order Granting Motion for New Trial. CR: 51

On June 22, 2015, the State filed its Notice of Appeal. CR:55.

## STATEMENT REGARDING ORAL ARGUMENT

Appellee does not request oral argument. Therefore, unless the Court requires oral argument, the State need not be concerned about being "allowed" to attend.

## STATEMENT OF FACTS[3]

On January 26, 2014, Appellee was arrested, along with Jose Cortez, by DPS Trooper Jered Snelgrooes (hereinafter "Snelgrooes" or "the Trooper"). The pair were charge with Possession of a Controlled Substance (Methamphetamine) With Intent to Deliver, Over 400 grams. CR: 8, 24. They were indicted by the Potter Grand Jury on November 12, 2014.

---

[2] Hereinafter, all references to facts contained in the reporter's record for the Cortez suppression hearing are designated CRR. That record is attached as Appendix B.

[3] Counsel for Appellee agrees with the State's basic rendition in its Statement of Facts, and will not seek to "reinvent the wheel."

2

On April 28, 2015, Appellee pleaded guilty to the charge, pursuant to a plea agreement. She executed the required paperwork, including waivers of time to file a Motion for New Trial and Notice of Appeal. CR:33. She was sentenced in accordance with the plea agreement. PRR 10. CR: 42-44.

On May 4, 2015, a suppression hearing was conducted in Jose Cortez's case, and the court granted his suppression. The State has appealed that finding, and the matter has been submitted to this Court in No. 07-15-00196-CR.

On May 15, 2015, Appellee filed her Motion for New Trial and Motion in Arrest of Judgment. The motion states that "the officer's testimony [Cortez Suppression Hearing] is new evidence which was not available or known at the time the movant entered her plea of guilty." CR: 45.

On June 9, 2015, the Trial Court conducted its hearing on Appellee's Motion for New Trial. Although no witnesses were called, Appellee's trial counsel offered the reporter's record from the Cortez suppression hearing, and the Trial Court's Findings of Fact and Conclusions of Law in that matter. RR: 6.

The Trial Court signed its Order granting Appellee's Motion for New Trial on June 12, 2015. CR: 51.

## ISSUE PRESENTED

**THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY GRANTING**

## APPELLEE'S MOTION FOR NEW TRIAL

## SUMMARY OF THE ARGUMENT

Appellee offers her response to three of the State's four bases of complaint. She argues that the State's position with regard to her waiver of time to file a Motion for New Trial is without merit and without any authority whatsoever. A Trial Court has the authority to allow a defendant to appeal, in spite of a waiver. It follows that it also has the authority to allow a Motion such as Appellee's.

Appellee next responds to the State's allegations regarding new evidence. Appellee's Motion for New Trial was sufficiently specific to advise the State of the nature of the new evidence. The evidence was material and, absent a crystal ball, Trial Counsel for Appellee could not have discovered by the exercise of due diligence. It was not merely cumulative, corroborative, collateral or impeaching, and would have likely resulted in a different result.

Appellee's Motion requested the Court grant the new trial in the interest of justice. She set for a specific valid legal ground for relief in her motion, set forth evidence to substantiate that claim, and showed prejudice.

## ARGUMENT AND AUTHORITIES

"Historically, we have consistently held that a trial judge has the authority to grant a new trial 'in the interest of justice' and that his decision to grant or deny

a defendant's motion for new trial is reviewed only for an abuse of discretion."

*State v. Herndon*, 215 S.W.3d 901, 906-907 (Tex. Crim. App. 2007). The test for abuse of discretion, "is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action; rather, it is a question of whether the trial court acted without reference to any guiding rules or principles, and the mere fact that a trial court may decide a matter within its discretionary authority differently than an appellate court does not demonstrate such an abuse." *Id* at 907-908, (quoting *Howell v. State*, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005) quoting *Brown v. State,* 870 S.W.2d 53, 55 (Tex. Crim. App. 1994)).

*Waiver*

The State first argues that Appellee waived her rights to seek the relief the Trial Court granted. It argues that "to hold otherwise would be to make the plea process a meaningless chore devoid of any purpose at law and rob the State of any value in the plea bargaining process." Appellant's Brief: 5. The State then attempts to convince the Court that allowing a defendant to file a Motion for New Trial portends a fearsome new world in which the sky is falling. "That, in turn would raise the **spectre** (emphasis mine) of what is the purpose of the formality of having a defendant execute the plea forms; of receiving the oral admonishments of the court and all the other statutory and constitutional formalities that must occur

5

before a plea is entered if a defendant may **set them aside at will** (emphasis mine). Appellant's Brief 8.

It then proceeds to make a summary statement that the trial court abused its discretion by granting the Motion for New Trial by referring to *Estrada v. State,* a case in which the defendant's Motion for New Trial was **denied** by the trial court. *Estrada*, 149 S.W.3d 280, 282-283 (Tex. App.–Houston [1ˢᵗ Dist.] 2004, pet. ref'd). The relevant facts in that case, to which the State fails to draw the Court's attention, are a) the denial of a new trial was appealed without permission of the trial court; b) there is no prohibition on the filing of a Motion for New Trial.

Appellee does not have the authority to set waivers aside "at will," but the Trial Court does, upon a valid motion. While Appellee did execute the waivers, including the time for filing a Motion for New Trial and Notice of Appeal, the State makes no argument nor cites any authority which would deny the Trial Court to grant its permission to file those pleadings. Neither does it direct this Court to any case law, statute, or treatise which makes the waiver of time to file a Motion for New Trial irrevocable.

Although appeals in plea bargained cases must be with permission of the trial court, except on those matters which have been raised by written motion filed prior to trial, there is no corresponding requirement regarding Motions for New

6

Trial. Tex.R.App.P. 25.2(a)(2). Tex.R.App. P. 21. It stretches the bounds of common sense to posit that the Trial Court has the authority to grant permission to appeal in contravention of a prior waiver, but deny it that same power to entertain a timely filed Motion for New Trial. The Trial Court implicitly allowed Appellee to overcome her waiver of time to file her Motion for New Trial by granting the hearing, and then granting the new trial. Had the Trial Court intended to enforce Appellee's waiver as it pertained to the filing of her Motion for New Trial, it could have done so by written order, setting out the waiver of time as its ground for denial. The Trial Court did not abuse its discretion in granting the Motion for New Trial.

### *No New Evidence*

The State next argues that Appellee was not entitled to a New Trial based on new evidence. It specifically avers that, in fact, there **was** no new evidence. Although the Clerk's Record indicates that Trial Counsel received all items the State provided, it does not establish that additional evidence did not exist. CR:30.

Trooper Snelgrooes' testimony during Cortez's suppression hearing was new evidence. It was only during cross-examination that evidence outside that provided under Article 39.14 of the Texas Code of Criminal Procedure was produced.

7

The new evidence, as specifically pled in Appellee's Motion for New Trial, indicated that the trooper was breaking the law in order to observe the vehicle, (CRR 21-22) that his reason for taking notice was that it was "very clean," (CRR 18), and that it held two occupants. CRR 19. Further, Appellee's Motion for New Trial specifically pled that the trooper's testimony, unknown at the time of the plea, proved the stop was without reasonable suspicion and therefore unconstitutional. As factual evidence to sustain her claims, Appellee's attorney tendered the transcript of the trooper's sworn testimony, and it was admitted without objection. RR 6.

The trooper's testimony was that his first supposed observation of an alleged violation occurred while he was alongside the vehicle in which Appellee was a passenger. CRR 16, 17. He further testified that at the time he claims to have observed a violation, he was actually typing on his in-car computer system to run the plates on the vehicle. RR 23-24. As the testimony also revealed, at the time of this "observation," no in-car audio existed. CRR 25. Without audio, personal law enforcement experience, or previous experience with law enforcement officers admitting to typing while driving, essentially *distracted* driving, trial counsel had no basis upon which to question the trooper's ability to observe what he claimed. In addition, even if the trooper was somehow able to

8

observe the alleged violation while presumably safely operating his vehicle at highway speeds while simultaneously typing on his in-car computer, the violation would have fallen under an exception to the statute upon which he based his stop–to allow another vehicle traveling faster to pass. Transp. 545.058(a)(5). He testified that he had gotten in behind the vehicle, (CRR 19) and also that the first violation occurred just as he was paralleling the vehicle in the left lane. CRR 17, 21. He admitted that posted signs on the interstate mandated that the left lane was for passing only. CRR 20-21.

By definition, the trooper could **only** have gotten parallel to the vehicle from a position behind that vehicle by traveling faster. Because the trooper was in the left lane, posted for passing only, the "violation," if it occurred, was no violation at all. It was an exception with which the trooper was familiar. Therefore, he had no reasonable suspicion to effect the stop based on this occurrence.

The trooper's testimony regarding his second observation of an alleged violation is even more troublesome. He states that he observed the vehicle to cross the fog line as it was exiting the highway. CRR 35-36. He agrees that exceptions exist to the prohibition against driving on the improved shoulder, and that one of them is to decelerate before making a right turn. CRR 11, 37. See

9

Transp. 545.058(a)(3). His testimony, however, is conflicting. He first states that the vehicle is not making a right-hand turn. CRR 37. He admits a right turn signal was used (CRR 38), that the location where the vehicle ultimately stopped was the Love's truck stop (CRR 41), and that the truck stop was located on the right side of the road. CRR 39. He then states that the vehicle was attempting to turn right. CRR 38. This admission, in which he implicitly concedes both that the exception to the statute exists, and that the situation he describes falls squarely within that exception, are facts that trial counsel could not have anticipated, nor discovered in the exercise of due diligence.

The trooper's testimony was identified in Appellee's motion as new evidence. Counsel for the State points to no requirement that every statement in the testimony be specifically quoted. Appellee's Motion, accompanied by trial counsel's sworn affidavit, pled that the evidence was unknown prior to trial. The trooper's testimony was elicited by very specific questions from Cortez's trial counsel, and failure of Appellee's trial counsel's mind-reading abilities, both as to the trooper's conflicting testimony **within Cortez's hearing itself**, and as to every conceivable question that might be asked by every attorney within or without the state, can not be construed as a lack of due diligence. The testimony, standing alone, demonstrates that the evidence was not merely cumulative, corroborative,

10

collateral or impeaching. It was an utter absence of reasonable suspicion for the stop. Such a deficiency would, by its very nature, have likely resulted in a different result in the case.

### *Issues Not Presented*

Appellee tenders no response to State's Brief on this sub-issue.

### *Failure to meet the <u>Zalman</u> Standards*

The Trial Court's Order states, "The court finds that the Motion should be and hereby is: GRANTED, IN THE INTEREST OF JUSTICE." A trial court has discretion to grant a new trial in the interest of justice if the defendant 1) sets forth a specific and valid legal ground for relief in her motion, 2) points to evidence in the record (or sets forth evidence) that substantiates the same legal claim, and 3) shows prejudice under the harmless-error standards of the Rules of Appellate Procedure. ***State v. Zalman,*** 400 S.W.3d 590, 591 (Tex. Crim. App. 2013).

Appellee's Motion sets forth a specific and valid legal ground for relief. What the State characterizes as a "broad and vague assertion," is the precise wording of the statute which authorizes a new trial. Tex. R. App. P. 21.3. That basis is then refined by the inclusion of facts supporting the motion. It does not

11

require this Court to give broad reading, nor to indulge Appellee with "the greatest of latitude." The State's sarcastic claim that the subject of new evidence *could* be found to be valid legal ground for relief seems to forget its own reference to the Code of Criminal Procedure. Once again, the State has failed to bring this Court's attention to any authority which states that the motion was untimely or unlawfully raised. The phrase "otherwise cognizable in the posture of this case" is indecipherable in the context in which it was offered. *Zalman's* first requirement has been met.

The second requirement is that Appellee point to evidence in the record (or set forth evidence) that substantiates the same legal claim. The Reporter's Record from the Cortez hearing was admitted without objection. The State's claim that Appellee "utterly failed" to meet this prong is without merit. It goes further, stating that no mention or argument in support of a claim of new evidence was made, with the exception of quoting trial counsel's tender of the Reporter's Record. Appellee's legal claim, as stated in her Motion, was that the verdict was contrary to the law and the evidence. The new evidence was cited as a basis for that legal claim. The Trial Court was entitled to determine that, based upon the trooper's testimony, new evidence, the verdict in the case was contrary to the law. A plain reading of the testimony clearly shows that the trooper had no legal basis

for the stop *whatsoever*. Appellee was not required draw a diagram showing the Trial Court what it already knew–that there was no valid basis for the stop. The second requirement has been met.

Appellee was sentenced to twenty-five years in the Texas Department of Criminal Justice. PRR 10. The testimony upon which Appellee claims new evidence was not taken until six days later. Prejudice to Appellee's substantial rights is to be reviewed under the standards in Rule 44.2 of the Texas Rules of Appellate Procedure. There is no requirement that Appellee dictate to the Trial Court under which standard to conduct the review. The State insinuates that because counsel "failed to identify the new evidence," (certainly a disputed claim), the Trial Court was incapable of determining whether to conduct the review under subsection (a) or subsection (b). The Trial Court did not sign its order until three full days following the hearing. That the matter was reviewed and thoughtfully considered is apparent.

A lengthy footnote to a Court of Criminal Appeals case from 2007 bears considering:

> Although not mentioned by the parties or the court of appeals, the general rule is that a trial court's ruling will be upheld if is correct on any applicable legal theory, even if the court articulated an invalid basis. This is the "right ruling, wrong reason" doctrine. *See, e.g.,*

13

*Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937) ("In the review of judicial proceedings the rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason."); *Arnott v. State,* 498 S.W.2d 166, 179 (Tex. Crim. App. 1973) ("Even if a trial judge relies upon a wrong ground or gives the wrong reason for a ruling, this Court is not bound to limit its consideration to such a reason if the decision below is correct."). *Cf. Cooper v. State,* 933 S.W. 2d 495, 497 (Tex. Crim. App. 1996)("when a trial court's ruling on the admission of evidence is correct, although for a wrong or insufficient reason, this Court will not reverse if the evidence is admissible for any reason.")

**State v. Herndon,** 215 S.W.3d 901 (Tex. Crim. App. 2007)

The third requirement of **Zalman** has been satisfied, contrary to the State's claim that the Court could not have conducted the review. The Trial Court did not abuse its discretion in this regard.

## CONCLUSION AND PRAYER

Appellee articulated through her pleadings a legally valid claim for relief, and presented evidence sufficient in support of that claim. The Trial Court did not, as the State accuses, render its decision without reference to guiding principles or contrary to the law. It did not abuse its discretion in the granting of Appellee's Motion.

Appellee prays that this Court enter an order affirming the Trial Court's

decision, and allowing a new trial to proceed.

Respectfully submitted,

*/s/ Dianna L. McCoy*
DIANNA L. McCOY
Attorney for Rosa Elena Arizmendi
112 S.W. 8th, Ste. 540
Amarillo, TX 79101
Tel. 806-373-4025
Fax 806-350-5414
Email dianna.mccoy@gmail.com
SBN 24026865

## CERTIFICATE OF COMPLIANCE

In accordance with Tex.R.App.P. 9.4(i)(3), I hereby certify that the foregoing brief contains, as reflected in the computer program word count, 3208 words.

*/s/ Dianna L. McCoy*

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2015, a true and correct copy of the foregoing brief was served on counsel for the State, in accordance with the Texas Rules of Appellate Procedure.

*/s/ Dianna L. McCoy*

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 68,589-E

THE STATE OF TEXAS      ) IN THE DISTRICT COURT
                       )
                       )
VS.                   ) POTTER COUNTY, TEXAS
                       )
                       )
ROSA ELENA ARIZMENDI    ) 108TH JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GUILTY PLEA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 28th day of April, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Douglas Woodburn, Judge presiding, held in Amarillo, Potter County, Texas;

Proceedings reported by Stenographic Method.

A P P E A R A N C E S

FOR THE STATE OF TEXAS:

    SBOT NO. 00784534
    Mr. Richard Wayne Martindale
    Potter County Assistant District Attorney
    Potter County Courthouse
    501 South Fillmore, Suite 5A
    Amarillo, Texas 79101
    (806) 379-2325

FOR THE DEFENDANT:

    SBOT NO. 24026865
    Ms. Dianna McCoy
    Attorney at Law
    112 SW 8th Avenue, Suite 301-I
    Amarillo, Texas 79101
    (806) 373-4025

CHRONOLOGICAL INDEX

April 28, 2015                                    Pg   Vol

Appearances.....................................  2    1

Case Called.....................................  6    1

Defendant's Plea of Guilty......................  7    1

Defendant Sentenced............................. 10    1

Proceedings Concluded........................... 11    1

Reporter's Certificate.......................... 12    1

ALPHABETICAL INDEX

| WITNESS | DX | CX | RDX | RCX | FDX | FCX | VD | VOL |
|---------|----|----|----|----|----|----|----|----|

**NO WITNESSES WERE CALLED**

                              EXHIBIT INDEX

STATE'S
NO.      DESCRIPTION                    OFFERED    ADMITTED    VOL

              **NO EXHIBITS WERE MARKED OR ADMITTED**


DEFENDANT'S
NO.      DESCRIPTION                    OFFERED    ADMITTED    VOL

              **NO EXHIBITS WERE MARKED OR ADMITTED**

**P R O C E E D I N G S**

April 28, 2015

(Open court, Counsel and Defendant present)

THE COURT:  At this time, we'll call -- is it Ms. Arizmendi?

MS. MCCOY:  Arizmendi; yes, sir.

THE COURT:  Arizmendi.

All right.  At this time, I'll call State versus Rosa Elena Arizmendi.

What says the State?

MR. MARTINDALE:  Your Honor, State is ready for a plea of guilty to the indictment, with an agreement as to punishment.

THE COURT:  And the Defense?

MS. MCCOY:  Defense is ready, Your Honor. We waive formal reading of the indictment.

THE COURT:  All right.  Thank you.

Are you Rosa Elena Arizmendi?

THE DEFENDANT:  Arizmendi.

THE COURT:  Arizmendi?

THE DEFENDANT:  Uh-huh.

THE COURT:  Is that yes?

THE DEFENDANT:  Yes, sir.  Sorry.

THE COURT:  Okay.  You've been charged in this case with possession with the intent to deliver a

controlled substance. That is a Texas Health and Safety Code violation that carries a range of punishment of not less than 15 years, nor more than 99 years, or life in prison -- whoops. I'm sorry. No, just 99 years -- and a fine not to exceed $250,000.

THE COURT: Have you been served with a copy of the indictment in this case and had a chance to go over that with Ms. McCoy?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand what it is they say that you've done?

THE DEFENDANT: Yes, Your Honor.

THE COURT: How do you plead to that charge, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Are you pleading guilty because of any fear or threat that you've been placed under in order to get you to do this?

THE DEFENDANT: No, sir.

THE COURT: Are you pleading guilty because you are, in fact, guilty and for no other reason?

THE DEFENDANT: No.

THE COURT: In other words, that's the only reason that you're --

THE DEFENDANT. I'm sorry. Yes.

THE COURT: -- pleading guilty? Nobody is making you do this. Right?

THE DEFENDANT: No, nobody is making me, sir.

THE COURT: You're not doing it because you're afraid. Right?

THE DEFENDANT: No, sir.

THE COURT: But you're doing it only because you are, in fact, guilty. Is that what you're telling me?

THE DEFENDANT: Yes, sir.

THE COURT: Are you a citizen of the United States?

THE DEFENDANT: Yes, sir.

THE COURT: Are you mentally okay today?

THE DEFENDANT: Yes.

THE COURT: Were you mentally okay when you committed this offense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You have signed a number of documents called waivers in which you give up all of your statutory and constitutional rights. Did you do so understanding what those rights were and after consultation with Ms. McCoy?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And are you asking me to allow you to give those rights up this morning?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. I will do so.

In addition to that, you signed a document called a judicial confession in which you state that everything contained in the indictment is true and correct. Is that also what you're telling me as well?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You understand that any proposal from the State is not binding on me? I don't have to go along with what the State's recommendation is?

THE DEFENDANT: Yes, Your Honor.

THE COURT: But if I do go along with that recommendation, you'll have no right to appeal that decision after today. Did you understand that as well?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. What is the State's recommendation?

MR. MARTINDALE: Your Honor, State is recommending 25 years confinement in TDC and a $5,000 fine.

THE COURT: Was that your understanding of what the State was going to recommend?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you asking me to approve of that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Rosa Elena Arizmendi, it is the finding of the Court that you are competent and I will accept the State's recommendation.

I do hereby find you guilty of the underlying offense and sentence you to serve 25 years in the Texas Department of Corrections, as well as pay a $5,000 fine. I will give you credit, however, for all time that you have served awaiting today's trial.

That concludes today's hearing. Good luck to you.

THE DEFENDANT: Okay. Thank you, Your Honor.

(Counsel conferring off the record)

THE COURT: Is there something else we need to -- before you leave; just a second.

MS. MCCOY: No, Judge. I just was double-checking that she was given credit for time that she was confined in the Los Angeles County jail, and, in fact, that is reflected in the judgment.

THE COURT: All right. Thank y'all.

MR. MARTINDALE: Thank you, Your Honor.

(End of proceedings)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS   )
                     )
COUNTY OF POTTER     )

I, Jana Smith, Official Court Reporter in and for the 108th District Court of Potter County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 31st day of August, 2015.

*Jana Smith*
_____
Jana Smith, Texas CSR 3179
Expiration Date:  12/31/15
Official Court Reporter
108th District Court
Potter County, Texas
Amarillo, Texas  79101

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 68,587-E

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| VS. | ) | POTTER COUNTY, TEXAS |
| | ) | |
| | ) | |
| JOSE LUIS CORTEZ | ) | 108TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HEARING ON MOTION TO SUPPRESS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 4th day of May, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Douglas Woodburn, Judge presiding, held in Amarillo, Potter County, Texas;

Proceedings reported by Stenographic Method.

A P P E A R A N C E S

FOR THE STATE OF TEXAS:

SBOT NO. 00784534
Mr. Richard Wayne Martindale
Potter County Assistant District Attorney
Potter County Courthouse
501 South Fillmore, Suite 5A
Amarillo, Texas 79101
(806) 379-2325

FOR THE DEFENDANT:

SBOT NO. 24062772
Mr. Q. Todd Hatter
Attorney at Law
720 S. Tyler, Suite 110
Amarillo, Texas  79101
(806) 220-0005

CHRONOLOGICAL INDEX

May 4, 2015                                              Pg   Vol

Appearances.....................................  2    1

Case Called.....................................  6    1

STATE'S

| ORAL EVIDENCE | DX | CX | RDX | RCX | FDX | FCX | VD | VOL |
|---|---|---|---|---|---|---|---|---|
| JERED SNELGROOES | 8 | 16 | | | | | | 1 |

State Rests.................................... 43    1

Defendant's Closing Argument................... 43    1

Court's Ruling................................. 48    1

Proceedings Concluded.......................... 48    1

Reporter's Certificate......................... 49    1

ALPHABETICAL INDEX

| WITNESS | DX | CX | RDX | RCX | FDX | FCX | VD | VOL |
|---------|----|----|-----|-----|-----|-----|----|----|
| JERED SNELGROOES | 8 | 16 | | | | | | 1 |

                    EXHIBIT INDEX

STATE'S
NO.      DESCRIPTION                    OFFERED    ADMITTED    VOL
 1       CD/DVD                           48          48        1




DEFENDANT'S
NO.      DESCRIPTION                    OFFERED    ADMITTED    VOL

          **NO EXHIBITS WERE OFFERED OR ADMITTED**

**P R O C E E D I N G S**

**May 4, 2015**

(Open court, Counsel and Defendant present)

THE COURT:  At this time I'll call State versus Jose Luis Cortez.

And my understanding is that we're here for a Motion to -- a proposed Motion to Suppress Evidence. Is that right?

MR. HATTER:  That's correct, Judge.

THE COURT:  All right.

MR. HATTER:  We filed a Motion in Limine, but it's just to keep out priors and extraneous, Judge.

THE COURT:  All right.  You may proceed.

MR. MARTINDALE:  Your Honor, for the purpose of this motion, the State would like to clarify we're proceeding only on the written motion provided by Counsel?

THE COURT:  Well, that's the only thing I know of.

MR. MARTINDALE:  Okay.  With that, the State would stipulate that there was no warrant for this arrest, Your Honor, or for the search.

THE COURT:  All right.  Then call your first witness.

MR. MARTINDALE:  We would call Trooper

Snelgrooes, Your Honor.

MR. HATTER: And, Your Honor, at this time, we would move to invoke the rule. And I don't know that other witnesses will be relevant for the proceeding, Judge, but we would ask that the other witnesses be removed from the other side of the wall, just because I have been able to hear some court proceedings when I've been in the adjoining room.

THE COURT: No.

MR. HATTER: Is the Court denying the motion to invoke --

THE COURT: They are not in the courtroom, and so, yeah, I deny your request.

(Witness entered courtroom)

MR. HATTER: Is the Court otherwise invoking the rule?

THE COURT: I'm sorry?

MR. HATTER: Is the Court otherwise invoking the rule?

THE COURT: Yeah. Otherwise, I'll invoke the rule.

Mr. Blais, would you inform them that the rule is invoked and for them, if they can somehow hear through that wall, not to listen.

MR. BLAIS: Okay. I have, but I'll make

sure.

THE COURT:  All right.

If you would, raise your right hand.

(Witness duly sworn)

THE WITNESS:  Yes, sir.

THE COURT:  All right.  You may proceed.

MR. MARTINDALE:  Thank you, Your Honor.

JERED SNELGROOES,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MARTINDALE:

Q.   Sir, could you please state your full name for the record.

A.   My name is Jered Snelgrooes.

Q.   Could you please spell both of those names for the court reporter.

A.   The first name is J-E-R-E-D; last name is S-N-E-L-G-R-O-O-E-S.

Q.   And how are you employed, sir?

A.   I'm currently employed with the Texas Department of Public Safety as a trooper.

Q.   How long have you been with that agency?

A.   October of this year will be six years.

Q.   Officer, have you had any specialized training in the area of the interdiction or investigation of

narcotics offenses?

A.   Yes, sir.  I've been to numerous classes.

Q.   Could you briefly describe those for the Court.

A.   Yes, sir.  I've been to Desert Snow training, which is an organization that primarily educates on drug trafficking and the proceeds that come from drug trafficking.  I've been to DIAP schools.  We have a state -- what we call a SCIT team, which is a State Criminal Interdiction and Training.  I've been to several of their classes.  Those are the main ones that I've been through.

Q.   During your -- you said six years with DPS?

A.   Almost six years.

Q.   Where all have you been stationed?

A.   I have been stationed in Hereford, Texas, and Amarillo, Texas.

Q.   And how long have you been in the Amarillo office?

A.   Roughly four years.

Q.   Would it be fair to say that you've spent the majority of that time working Interstate 40 that four years?

A.   Yes, sir.

Q.   Okay.  Sir, I want to direct your attention now back to January 26th, 2014.  Were you on duty that day?

A.   Yes, sir.

Q.   Can you briefly describe for the Court what were your duties that day.

A.   I was on night shift that particular evening. General duties:  Traffic patrol; if calls come in -- crash -- do crash investigation.  That particular night, I was on I-40, I believe, just west of Bushland at the time.

Q.   At that time, did you see anything that interested you; caused you -- attracted your attention?

A.   Yes, sir.

Q.   And what was that?

A.   I noticed a vehicle that came by my location. In the classes that I've been to, we look for specific things -- I call them indicators -- or certain things we're looking for in specific types of vehicles.  A vehicle came by my location; it caught my eye; I followed the vehicle; observed a traffic violation; made a traffic stop on the vehicle.

Q.   When you say you observed a traffic violation, could you describe for the Court exactly what you observed.

A.   Yes, sir.  On two different occasions, I observed the vehicle drive on the south side of I-40, the access -- not the access road -- but the improved

shoulder.

Q. Okay. Is that a violation of the law, as you understand it?

A. Yes, sir, it is.

Q. And do you recall specifically what that statute provides for?

A. There are seven specific times when you can drive on the shoulder; driving down the highway, it didn't appear that any of those seven instances were being committed at the time.

Q. Okay. So that caused you -- would it be fair to say to become curious as to the condition of the driver?

A. Yes.

Q. And what did you do then, sir?

A. I made a traffic stop on the vehicle. The vehicle was travelling eastbound on I-40 and we pulled into the Love's parking lot there on Arnot Road.

Q. Okay. At that time did you approach the vehicle?

A. Yes, sir.

Q. Were you able to identify the driver?

A. Yes, sir, I was.

Q. And who was that?

A. It was Mr. Cortez.

Q. Is the person known to you as Jose Luis Cortez in the courtroom today?

A. Yes, sir, he is.

Q. Could you please point to him and describe what he's wearing.

A. The black shirt with the gray stripes (indicating).

Q. Okay. Did you seek to obtain a driver's license from the Defendant?

A. Yes, sir, I did.

Q. Did he have one?

A. I believe that he did. Yes, sir, he had a -- I believe it was California driver's license.

Q. Okay. Did he say anything to you about the status of that driver's license?

A. I'd have to check my report.

(Witness viewing report)

A. He actually did tell me, he said, yes -- yes, I do, but it's suspended for a ticket; that's the reason that it's suspended.

Q. Okay. So he indicated that he had a suspended driver's license?

A. Yes, sir.

Q. Okay. What happened then, sir?

A. Usually, on -- on most traffic stops, I usually

invite the driver back to my vehicle. And I say usually. I've -- in working, I've noticed that sometimes if there's a language barrier, it's often hard to communicate to get the vehicle -- the people back to the vehicle and then back to their vehicle so they can be on the roadway. In the patrol cars that we have, there's a limited amount of space. So usually there's three instances where I won't remove someone from the vehicle; that's if there are small children in the vehicle that are unattended; if they are usually large or obese, won't be able to fit in my vehicle; if there's a language barrier.

In this case, there was none of those situations, so I asked the driver to step back to my vehicle. He agreed. He exited the vehicle. I usually have the driver sit in the front seat with me.

Q. Did you speak to him as to the reason for the stop?

A. Yes, sir, I did. I briefly explained to him the reason for the traffic stop. In most instances, I usually -- in this particular stop, we're usually looking for intoxication or possibly even driver fatigue. With a California driver's license -- I believe the vehicle had California plates. Later in the evening, I check on people like that for intoxication or

possibly being fatigued.

Q. Okay. Trooper, was your unit equipped with video equipment on this night?

A. Yes, sir, it is.

Q. Was it capable of accurately recording the events as they occurred on January 26th, 2014?

A. Yes, sir.

Q. Have you had an opportunity to review that video?

A. Yes, sir.

Q. Did it fairly and accurately record the scene as you recalled it on January 26th, 2014?

A. Yes, sir, it did.

MR. MARTINDALE: At this time, Your Honor, the State would request to play the beginning portion of that video that involved the traffic stop.

MR. HATTER: No objection.

THE COURT: You may do so.

THE REPORTER: And I won't take it down -- it's not an exhibit or anything?

MR. MARTINDALE: Yes. At this time, we're offering it for the Court's information and we will not admit it at this time. Likewise, we would move that the court reporter not be required to record any verbal conversation that occurs during it.

MR. HATTER: Your Honor, we would ask that the court reporter specifically record what the officer says at the time he approaches the vehicle and tells my client the reason for the traffic stop.

THE COURT: Overruled.

MR. HATTER: And we have no objections to the purpose of the video or audio being played for pretrial hearing purposes.

(Video being played in open court)

THE COURT: Is the audio on?

MR. MARTINDALE: It will not come on until the lights are turned on, Your Honor.

(Pause in proceedings)

(Video being played in open court)

Q. (BY MR. MARTINDALE) Officer, does that reflect your memory of what occurred on that evening?

A. Yes, sir.

Q. Could you describe for the Court where you observed him cross over onto the shoulder?

A. Right as we -- right as you exit the -- the I-40 on the, I guess, the exit ramp. Whenever he comes across the white fog line, right there on the right-hand side, when he exited, he came across the white stripe, just shy of the access road.

Q. Okay. Was there any other time?

A.   Yes, sir.   Usually, what I do on my traffic stops is I will parallel the vehicle.   And what I was doing in this instance -- I usually run the license plate and make sure that, you know, the registration is current and all that stuff; kind of know who I'm dealing with.   And when -- and I run the registration that way, and then whenever I was sitting next to him, he drifted across right prior to me sliding in behind him.

MR. MARTINDALE:   Your Honor, since the only grounds in the Motion is that the Defendant alleges there was no probable cause or lawful reason for the traffic stop, the State will pass the witness, Your Honor.

CROSS-EXAMINATION

BY MR. HATTER:

Q.   Good morning, Officer.

A.   Good morning, sir.

Q.   My name is Todd Hatter.   I'm the attorney for the accused.   Let me ask you about your training.

A.   Yes, sir.

Q.   Now, you said that you had attended Desert Snow.   Correct?

A.   Yes, sir.

Q.   That's a private company, is it not?

A.   Yes, sir.

Q. Do you know if that private company has any state certified officers that are involved in the training?

MR. MARTINDALE: Your Honor, object to relevance.

MR. HATTER: Judge --

THE COURT: Sustained.

MR. HATTER: -- we just heard all this training about Desert Snow and attending; we'd just like to follow-up on the --

THE COURT: Yeah, I understand, but, you know, the only issue to me is whether he crossed the white line. It doesn't matter how much training you've got; we've got the video.

MR. HATTER: I understand your ruling.

Q. (BY MR. HATTER) So, Trooper, tell the Court exactly where my client was at the time you say you witnessed the first violation.

A. The first violation was just -- just as I'm paralleling him, I'm off his left quarter. Actually, I usually run the license plate at that point. I'm sitting there and you see him fade to the right-hand side, crossing the white line.

Q. And are you telling this Court that that is visible on the video?

A.   Yes, sir, it is.

Q.   Okay.  Can you tell the Court about what mile marker that occurred at.

A.   It would have been roughly between the 59 and 60 mile marker; Arnot Road is the 60 exit.

Q.   So it was in that last mile is what you're telling the Court was the first violation?

A.   Yes, sir.

Q.   Now, at that point, you're saying that you were already beside my client's vehicle.  Correct?

A.   Yes, sir.

Q.   Okay.  I want to back up just a little bit to when you told the Court that you said, he came by my location and I observed certain things that caught my attention.  What were those certain things?

A.   Yes, sir.  Whenever I was -- when he first came by me, I was sitting on the access road underneath the lights there at the Bushland overpass.  When he came by me, like I said, in the training, there's several indicators we're looking for.  Each indicator in and of itself is nothing, but put with the totality of the circumstances, they can be something.

The vehicle came by me.  It was a mid to late model mini van.  It was very clean.  I noticed with the lights, you know, it kind of had a good -- a shine

reflection to it. It came by my location; I saw that. I got in behind the vehicle. I noticed there was two occupants -- what I guess was two occupants, based on the shadows. A mini van, clean, with the two occupants in it and then the temporary -- not the temporary registration -- but the newer registration on the vehicle.

Q. So you're telling the Court that because you see a van, it's clean and it's got two people in it, that was indicators of potential criminal activity for you?

A. Yes, sir, they are. They -- in and of themselves are nothing, but in the total -- when you start adding them all together, they can be.

Q. But you don't get anything to add up until you stop them. Right?

A. No, sir.

Q. Pardon me?

A. No, sir, I do not.

Q. Okay. So you agree with me?

A. Yes, sir; in and of them self, they're nothing.

Q. And at that point you're just looking at a van that's clean with two people in it?

A. Yes, sir.

Q. Is it equally important in your mind that it's

California tags?

A.   Being on the interstate, the California tags had really no importance to me.

Q.   It's not important to you at all that it's coming from a state presumably that legalized marijuana?

A.   Marijuana wasn't found in the vehicle.

Q.   I'm not asking you, Trooper, about what was found.  I'm asking you about what was going through your mind when you say I observed certain things that caught my attention.  Did a California tag catch your attention and make you believe that this vehicle is from a state that legalized marijuana?

A.   That is my knowledge.  I know it is; it's legalized, yes, sir.

Q.   Now, Trooper, you'd agree with me that law enforcement shouldn't break the law in hopes of some day catching somebody breaking the law, wouldn't you?

A.   Yes, sir, I do agree.

Q.   Okay.  But in this case you did exactly that, didn't you?

A.   No, sir.  I made a traffic stop for a violation.

Q.   Okay.  Let's back up from the traffic stop.  Around that mile marker 59, 58, isn't there signs posted on both sides of the Interstate 40 for eastbound traffic

that say left lane for passing only?

A. Yes, sir.

Q. Okay. And in the video we can clearly see your patrol car move to the left lane, can't we?

A. Yes, sir.

Q. And you had no intention of passing my client, did you?

A. No, sir.

Q. Instead, you merely wanted to get closer and take a look at him, so you were intentionally operating your patrol car in that left lane with no intention of passing. Isn't that correct?

MR. MARTINDALE: Object to relevance, Your Honor.

THE COURT: I'll allow the question.

A. Can you restate the question for me.

Q. (BY MR. HATTER) Okay. Isn't it true that in that video, it clearly shows that you moved your marked patrol unit into that left lane, even though there were signs on both sides of the road, saying left lane for passing only, and you have absolutely no intention of passing my client? You were merely moving into position where you could look at him and see what's going on with him and his vehicle and the occupant.

A. Yes, sir, I did get in the left lane to do

that.

Q. That would be a violation, wouldn't it?

A. In our particular job, we are actually -- we have exemptions; certain exemptions allow us to do certain things that the other motorized public aren't allowed to do; such as, speeding after -- like -- if I'm going after someone who is speeding, obviously, I can't go 75 to catch them. So there are exemptions for us to allow us to do stuff like that.

Q. But the exception you're referring to is when you have observed a violation and you're in pursuit of a violator. Correct?

A. Yes, sir; yes, sir.

Q. Okay. But in this instance, you're breaking the law and you don't have a violation yet. Correct?

MR. MARTINDALE: Again, objection; relevance, Your Honor.

THE COURT: Sustained.

Q. (BY MR. HATTER) You would stop another motorist if you saw them do what you did. Correct?

MR. MARTINDALE: Objection; relevance, Your Honor; speculation.

THE COURT: Sustained.

Q. (BY MR. HATTER) You'd agree with me, you don't pass my client?

A. I don't pass your client? What do you mean by that?

Q. Well, when you get in that lane, you don't pass him; you pull up close and then you back off and get behind him. Correct?

A. Yes, sir. I was running his license plate.

Q. You were checking to see if it was California and things of that nature. Right?

A. Yes, sir. I do -- I run -- I do that to every vehicle that I'm going to -- that I'm --

Q. Are you telling the Court that you ran a 28 on this vehicle?

A. Yes, sir, I did.

Q. And you did it right then?

A. Yes, sir.

Q. But we're not able to hear the 28 because we have no audio. Correct?

A. It doesn't read them; it only reads Texas plates. The computer will actually read a Texas plate out loud, but only Texas.

Q. Okay. So tell the Court how you ran the plate, the 28.

A. We have an in-car computer system and I manually type the California 28 and we're able to get returns in our computer system in our vehicles.

Q. So while you were in that left lane, you were typing on your in-car laptop, for albeit a better term; computer terminal?

A. Yes, sir.

Q. And that you manually ran it yourself, so there's not any recorded dispatch communication between you and dispatch. Right?

A. No, sir, not with the computer system.

Q. What's the (inaudible) loop --

THE REPORTER: I'm sorry?

Q. What's the recorder loop on your camera; how long?

A. The -- the camera system actually -- from when I activate my lights, it records two minutes prior to the actual lights being turned on and it's just -- it's just video; it's not audio.

Q. And when does the audio come on?

A. The audio comes on as soon as the lights are activated.

Q. What if you start a manual recording; do we get it all?

A. If I was to hit record, it would record -- the audio comes on immediately.

Q. Tell the Court what the reason was -- I mean, you know how to use that record button. Right?

A.   Yes, sir.

Q.   Because you were trained on your equipment.

A.   Yes, sir.

Q.   And you knew it all worked before you started your shift.  Correct?

A.   Yes, sir.

Q.   So tell the Court why you didn't hit record since you were pulling up alongside a vehicle that had already caught your attention and you observed what you believe might be criminal indicators.  Why did you not hit that record button where we had video and audio from the very beginning?

A.   There was no need for audio; it was just me and my patrol car.

Q.   Well, the question is why didn't you hit the button.  We would just get audio as one of the results.  Right?

MR. MARTINDALE:  Objection; asked and answered.

MR. HATTER:  Judge, I'm asking a different question.

THE COURT:  Well, I'll allow the question, but you don't need to respond to me.  I'll just decide.  Thank you.

MR. HATTER:  I wasn't clear --

THE COURT: You may ask the question.

MR. HATTER: Thank you, Judge.

Q. (BY MR. HATTER) So, Trooper, I'm asking you, why didn't you hit the manual record button since your equipment was functional and you knew how to use it?

A. I never record it unless -- unless there's an extenuating circumstance; like, I know if there's a curve in the road further east of that situation. If I have a violation and it's not safe for me to -- to stop the vehicle, I will hit record and speak to the violation; not stopping the vehicle because of safety concerns or make a traffic stop at that time. With the functioning equipment, it records two minutes, I know that. I've done this for five years. Rarely do I turn that camera on because it automatically turns itself on.

Q. Well, have you ever followed a vehicle more than two minutes?

THE COURT: Okay. This is really supposed to be whether or not, you know, this stop was lawful. Okay? So let's try to hone in on that because I've got a jury getting ready to come up here.

MR. HATTER: I understand, Judge.

Q. (BY MR. HATTER) Trooper, if we play that video again, would you be able to tell the prosecutor when to stop that video exactly when you see that first

violation.

A. When I see the first violation?

Q. Yes.

A. Yes, sir.

Q. Okay.

MR. HATTER: Your Honor, if we could play the video to where the officer could show you the violation?

THE WITNESS: May I step down, just to point out --

THE COURT: Yes.

THE WITNESS: Okay.

(Witness exited stand)

THE COURT: Do you want a laser?

THE WITNESS: It's pretty noticeable.

(Video being played in open court)

A. Actually, this is where I'm flying up to -- I'm pulling up, fixing to run the registration of the vehicle.

If you watch his left tire -- see, he's already drifted right there. He's already drifted the -- the distance from the center stripe to the edge of the roadway, he's done it right there.

Q. (BY MR. HATTER) Do we need to stop the video?

A. You should have already stopped it.

Q. Okay. Can we back it up?

We just want you to say the word "stop" when you claim you see a violation.

A. Okay.

(Video being played in open court)

A. Stop.

Q. Okay. Can you walk up to the board and show the Court what you claim to be a violation.

A. With my -- with the naked eye, the camera doesn't show it as greatly, but right here, he's on the -- he's on the white fog line right there.

Q. So, Trooper, when I asked you earlier if the violation could be seen on the video and you said yes --

A. Yes.

Q. -- now you're telling the Court it can't quite be seen clearly.

A. No, it can be seen in the video.

Q. Pardon?

A. It can be seen right there in the video.

Q. So you're saying that he's on the shoulder -- driving on the improved shoulder right now?

A. He's on the fog line right now, yes, sir.

Q. What's the width of that van?

A. The width? I couldn't tell you the width.

Q. About 6 feet?

A. It's probably longer than 6 feet.

Q. Not the length; the width.

A. The width? Yes, sir. It's probably --

Q. 6 foot, 4?

A. I would say 7, 8 feet, somewhere in there. I'm 6 foot tall and I imagine I couldn't lay the length of that car.

Q. Now, later you're going to testify that you know how that tire ought to (inaudible), but you don't --

THE REPORTER: I'm sorry. Later you're going to testify that you know how that tire what?

Q. (BY MR. HATTER) Later in the trial, you're going to testify at that trial that that tire was too heavy, as though you know what the tire should weigh or about. But you can't tell this Court whether that vehicle should be 6 foot or 8 foot wide?

MR. MARTINDALE: Objection; argumentative, Your Honor.

THE COURT: Sustained.

Q. (BY MR. HATTER) Can you tell the Court whether this van is 6 foot or 8 foot wide?

MR. MARTINDALE: Objection; asked and answered, Your Honor.

THE COURT: Sustained.

Q.   (BY MR. HATTER) Do you know any of the specs about this vehicle?

A.   No, sir; I know what I saw.

Q.   Do you know what the tire is supposed to weigh?

A.   I know that --

MR. MARTINDALE:  Objection; relevance, Your Honor.

THE COURT:  Sustained.

Let's get -- okay.  Is there anything further you want to present?

MR. HATTER:  Absolutely, Judge.

THE COURT:  All right.  Then do it.

Q.   (BY MR. HATTER) Are you aware that that lane is 15 feet wide from stripe to stripe?

A.   From --

Q.   In other words, from the center stripe out to that fog line?

A.   Yes, sir.

Q.   Okay.  That's right, isn't it; 15 feet?

A.   Yes, sir.

Q.   And you would agree with me that fog line, the white line on the right, is 4 inches wide?

A.   Yeah, I would --

Q.   Right at it?

A.   Yeah, right at 4 inches.

Q. How many inches is it across the white line?

A. It's on the white line.

Q. So it hadn't crossed it?

A. At this point?

Q. Well, this is where you said the --

A. He's on the shoulder. The --

Q. So --

A. The lane ends at the inside of that fog line.

Q. I'm sorry?

A. The lane -- excuse me -- the driving lane ends at that fog line.

Q. Where do you find that definition? If you're telling the Court that is the law, where do you find that definition that the driving lane ends at the inside edge of a fog line?

A. It ends at the fog line.

Q. Where does the shoulder begin?

A. At the fog line.

Q. Which side of the fog line?

A. I say inside; you say outside.

Q. Do you have any law to support your stop, Officer?

A. Yes, sir, I do.

Q. Okay. What is that law that you're referring to?

A. The second violation is committed as he's exiting the roadway and that is the one I stated to him.

Q. Okay. But, Trooper, I'm talking to you about this one right now.

A. Yes, sir.

Q. Okay. What law says where the shoulder begins?

A. There's not a law -- I don't know, to my knowledge, if there's a law that states where the exact lane ends.

Q. Okay. So you're not aware of a definition that says this is what an improved shoulder is. Correct?

A. The improved shoulder is the edge of the roadway.

Q. The part that's on the other side of the line. Right?

A. Not in my interpretation.

Q. Can you show the Court on that photo right there, the still shot, where that tire is across the line on the outside?

A. On the outside of the line?

        MR. HATTER: May I approach, Judge, so that I can see it?

        THE COURT: No; just stay there.

Q. (BY MR. HATTER) Trooper --

A. Yes, sir.

Q. -- can you show it to me?

A. Yes, sir. The white line (indicating) the break in the white line -- this is the fog line. The vehicle crosses on two different occasions. Once, being here; the second, being at the exit.

Q. But this is the only one I'm talking to you about right now.

A. Okay.

Q. Are you telling the Court that right there, that still shot --

THE COURT: All right. He said that the other one is the one that was the basis upon which he made the stop. He didn't turn his lights on here, so let's get to that, and you can talk about it there.

Q. (BY MR. HATTER) So, Trooper, I just want to clarify. Are you saying this right here is not --

THE COURT: All right. That's what I'm telling you; we're going to go to the next one. If you don't want to do that, then I'll overrule your motion.

MR. HATTER: Well, Judge, I just want clarification on what the Trooper's claiming --

THE COURT: All right. Motion is overruled.

MR. HATTER: Your Honor, we object to the Court stopping before the end of the hearing and without

us considering the primary reason for the stop.

THE COURT: I observed what I observed and I guess the appellate court can look at what they see.

MR. HATTER: May we take into consideration the second --

THE COURT: Well, if you'll do what I ask you to do, yes; if not, then we're going to stop the hearing.

MR. HATTER: We'll do whatever you instruct, Your Honor. I just need to --

THE COURT: All right. My instruction is if you -- if -- he has indicated that there was another stop -- another occasion in which he observed the vehicle cross the white line, and so if you want to get to that point, then by all means, get to that point.

MR. HATTER: Thank you, Your Honor.

Mr. Prosecutor, if you'll proceed with the video.

And, Trooper, if you'll tell the Prosecutor where to stop; that's all we need is the word "stop" when you see what you believe to be a second violation.

(Witness exited stand)

(Video being played in open court)

THE WITNESS: Stop.

Q. (BY MR. HATTER) Okay. Trooper, can you go up

to the video and point out for the Court how you believe that my client was driving on an improved shoulder.

A. Okay. Can I -- can we go just a little bit further? I think it's just a little bit further where I stopped it earlier.

(Video being played in open court)

A. Stop.

Casting a shadow, it completely crossed the white line here (indicating).

Q. Casting a shadow. Is it your testimony that the shadow crossed the line or the tire?

A. The tire crossed the line.

Q. And you can see that in that video?

A. I can see it in the video. If you play it through, he stays on it for 2 to 3 seconds.

Q. And so you're telling the Court that what you witnessed right there is why you stopped my client?

A. It's in my case report; it's two different instances.

Q. Is that your testimony today, Trooper?

A. It is my testimony that he crossed the white line on two different occasions.

Q. Would you agree with me that when you approach my client in his vehicle, when it's stopped at Love's, that you do not mention to him two instances that -- on

that initial contact, when you introduce yourself as a Texas Highway Patrol, you tell him that he crossed the line as he was exiting and getting off?

A. Yes, sir.

Q. So you agree with that testimony?

A. Yes, sir, I do.

Q. Okay. So if we go with what you tell my client at the time of approaching at the driver's side window, there was one violation is all you talked to him about at that point. Correct?

MR. MARTINDALE: Again, objection; relevance, Your Honor.

THE COURT: I'll sustain.

Q. (BY MR. HATTER) Trooper, would you agree that in your own report you put exceptions to the law?

A. Excuse me?

Q. In other words, when it's okay; when it's acceptable to drive on an improved shoulder?

A. Yes, sir.

Q. Okay. And those citations of law, those reference 5 -- traffic -- Texas Transportation Code 545.058, do they not?

A. I have 545.062 and 545.058.

Q. But you would agree with me that you mistakenly left 545.062 in your report, didn't you?

A.   I believe that they're both pertaining to it.

Q.   Pertaining to what?

A.   To the traffic law.

Q.   What is 062?

A.   Offhand, I could not tell you.

Q.   If I told you it's following too closely, would you then agree with me that it should be removed from this template report?

A.   If you told me that, yes, it should be taken away.

Q.   And if 058 accurately reflects the law on driving on improved shoulder, do you have any reason to doubt me on that?

A.   No, sir.

Q.   Okay.  Number three -- exception number three, says to decelerate before making a right turn.  Would you agree with that?

A.   As the law reads, yes, sir.

Q.   Well, I mean, that's all we're talking about here is the law.  Correct?

A.   Yes, sir.

Q.   Okay.  Would you agree with me that my client is moving to the right?

A.   He is not making a right-hand turn.

Q.   My question, Trooper, is would you agree with

me that my client is moving to the right?

A.   He does move to the right.

Q.   He gives a right turn signal, doesn't he?

A.   Yes, sir.

Q.   In fact, once he's exited this off ramp, he gives a right turn signal and he's still moving to the right, isn't he?

A.   He's attempting to turn right.

Q.   And you don't have any lights on him at that point, do you?

A.   Right.  Shortly after the violation, yes, sir, I do.

Q.   But what I'm saying, Trooper, is, to your knowledge, what you had to base your judgment on at the time is a car with a right turn signal moving right, exiting the freeway, moving right into an outside lane, because that's two-lane traffic.  Correct?

MR. MARTINDALE:  Your Honor, I'm going to object; he's arguing the law with this witness.

THE COURT:  Yeah, I agree with that.  I mean, you're certainly able to argue whatever you want to argue, but --

Q.   (BY MR. HATTER) Officer, would you agree with me that the vehicle is moving to the right?

A.   It does cross to the right shoulder, yes, sir.

Q. And you can't read his mind, can you?

A. No, sir.

Q. You don't know whether he's going to go to Love's or what, do you?

A. No, sir, I don't know what he's doing.

Q. How many businesses are right there at that intersection?

A. Two.

Q. Okay. Love's is one of them; that's on the right?

A. Yes, sir.

Q. Where's the other one?

A. There's another one further -- there's actually three; there's an RV campground further to the right and then there's -- I believe it's a horse hotel or something north.

Q. And what side of the road is it on?

A. It's on the north side of I-40; left side.

Q. So he would have to, at some point, give a left turn signal going to the Interstate to get over there?

MR. MARTINDALE: Objection; relevance, Your Honor.

THE COURT: All right. Anything further?

MR. HATTER: Yes, there is Judge. May I proceed?

Q.   (BY MR.  HATTER) Trooper, at the point when you claimed that my client had committed the first alleged violation, would you agree with me that you said he was drifting over; moving over a little to the right?

A.   Yes, sir.

Q.   And at that point you and your patrol car were coming up on him on the left side, as though you were going to pass him.  Would you agree with that?

A.   Sure.

Q.   Because, I mean, at nighttime, he probably couldn't tell whether you're a patrol car or not.  Right?

MR. MARTINDALE:  Your Honor, I'm going to object.  I think the Court has already addressed that we've covered the first --

THE COURT:  What's your point?

MR. HATTER:  Well, Judge, my point is that there's an exception in the law that says to allow another vehicle traveling faster to pass under sub 5 of 545.058.

THE COURT:  All right.

MR. HATTER:  So I just want to ask the Trooper a question about that.

THE COURT:  Well --

THE WITNESS:  May I answer it?

THE COURT: No; that's fine. We've gone far enough on that. I mean, since only one violation is all that it takes, even if he -- all of what you're telling me says otherwise, why, we'll see.

Q. (BY MR. HATTER) So, Trooper, it's your opinion that my client wasn't going with either of those exceptions on these violations. Is that your testimony to the Court?

A. It is my testimony that none of those exceptions were met.

Q. Pardon?

A. None of those exceptions were met.

Q. And what do you base that he wasn't making a right turn?

A. He did not make a right turn.

Q. He ends up parked at Love's, doesn't he?

A. Because I had my lights on him. It does not -- my -- I can't determine if he was going to Love's; if he was going to the RV park; if he was going to the horse hotel.

Q. So did you hit your lights prematurely and make this stop prematurely without seeing if he was going to make a right turn or not?

THE COURT: All right. If you have some argument -- I've heard all the facts that I deem

necessary for a decision in this case. So if there's anything further -- from the State, do you have anything further?

MR. MARTINDALE: No, Your Honor.

THE COURT: From the Defense?

MR. HATTER: Judge, may I ask just one final question of the Trooper?

THE COURT: All right.

Q. (BY MR. HATTER) Trooper, would you agree with me that as a result of this traffic stop and the reasons that you've already testified to, that ultimately you recover physical evidence that is alleged to be meth and obtain statements from my client and a co-defendant?

A. Did I?

Q. Law enforcement.

A. Yes, sir.

Q. So there was physical evidence and statements obtained as a result of this stop?

A. Yes, sir.

MR. HATTER: Pass the witness.

THE COURT: All right. You may step down.

MR. MARTINDALE: No further questions, Your Honor.

THE COURT: Okay. Sorry.

You may step down.

All right. Anything more from the State?

MR. MARTINDALE: Nothing further, Your Honor. State would rest.

THE COURT: From the Defense?

MR. HATTER: Yes, Your Honor. We would just have brief closing arguments, if you're ready to hear those at this time.

THE COURT: All right.

MR. HATTER: Your Honor, we believe that the video of that -- along with the totality of the circumstances, the trooper's testimony that he stopped a vehicle because it's a clean, white van, and then ultimately -- and he says that's what catches his attention. He doesn't know about the number of occupants until he gets up beside him. In fact, at the point when with trooper is breaking Texas law, violating the posted signs, driving in the left lane when not passing, merely in hopes of maybe eventually catching somebody breaking the law. There is no provision under Texas law for law enforcement to break the law -- traffic laws in order to maybe see somebody break the law. There's just no exception for law enforcement under these circumstances.

Once the officer got in the left lane and was not passing, he decides -- because the California

tags, because of two occupants, a van and it's clean -- that that's going to be reason he's going to stop and search this van.

The Court saw the video and there's two instances on there that the trooper pointed out. The first one, there's no way that trooper, as he's keying in information about license plate information to run a 1028, could tell 15, 16 feet over what's going on in the dark with this tire. Whatever was happening over there was shadowed by the car itself. There's no way that officer could see that.

The law specifically provides under 545.058 of the Transportation Code, sub 5, to allow another vehicle travelling faster to pass. When the trooper was in the left-hand lane, he was travelling faster because he was accelerating coming up on my client.

My client, whether he would know that it was an officer or not, was moving to the right. But there's no video evidence that he crossed the line, much less touched the line, and no evidence that he drove on the improved shoulder.

The second instance where the officer stopped us on the video, the video evidence shows that the tire is on a portion of the line. There's no evidence that he crossed the line or that he was on the

shoulder.

The trooper has chose to decide what the definition of improved shoulder is. Specifically, Judge, the Transportation Code 545.058 gives an exception to driving on the shoulder, even if the Court found that he did drive on the shoulder during the exit. And that exception is sub 3 to decelerate before making a right turn.

Everybody knows, Judge, when you get on an off ramp, you're coming down here to stop signs and businesses, you're expected to decelerate. That's what he's doing. We've got brake lights on in that video. He's decelerating -- he has the right under law, under sub 3, to drive on the shoulder.

There's no violation here, Judge. This was a pretext stop. The officer intended to search this vehicle and he does exactly that.

We'd move to suppress the evidence.

THE COURT: Is there a definition of shoulder? I take it there's not.

MR. MARTINDALE: Not that I'm aware of, Your Honor. I will provide the Court with State versus Wise where the officer reasonably believes he saw a violation, including the driving on the shoulder. Then he is justified in making the stop.

(Video being played in open court)

MR. MARTINDALE: As the Court can see on what's appearing on the screen right now, clearly, that vehicle is certainly on and a portion of it is over the white line. That being the case, Your Honor, I believe the officer had more than reasonable suspicion to detain that driver to figure it out.

At this point, the individual is on the off ramp; that is not making a right turn. The right turn occurs subsequently whenever the roadway allows for a turn into the particular business.

He's travelling, although, it's slightly angled, it's an off ramp -- that is a straight roadway; that is not a right turn. So at that point, while he may or may not be de-accelerating, he's not --

THE COURT: I agree; it's not a right turn.

MR. MARTINDALE: Thank you, Your Honor.

With that, we have nothing further.

THE COURT: All right. Continue on that. Is that -- that's all they've got is just right -- that one little spot?

MR. MARTINDALE: That's what the officer testified to; yes, Your Honor.

THE COURT: Back it up.

(Video being played in open court)

THE COURT: Is there even a shoulder there where he is?

MR. MARTINDALE: This area --

THE COURT: It looks like --

MR. MARTINDALE: -- right here is the shoulder, Your Honor, once you cross over that solid right line on the right.

(Video being played in open court)

MR. HATTER: Your Honor, we would ask that the Prosecutor stop the video at what the State claims is the maximum crossing or touching of the line, so that the Court can approach the screen, if necessary, so that I can approach the screen, and us look at that tire on that line, because it is visible on that video.

(Pause in proceedings)

THE COURT: I just want you to run it, please.

(Video being played in open court)

THE COURT: Okay. Stop it right there.

See -- okay. Go on a little bit.

See, I don't even think there's a shoulder there.

I'm going to sustain the Motion.

MR. MARTINDALE: With that, Your Honor, then the State would move to admit the video as State's

Exhibit 1 for these proceedings.

THE COURT: Okay.

MR. HATTER: Your Honor, I understood you to say you sustained the Motion to Suppress. Is that --

THE COURT: Yeah, I'm suppressing the results.

Let me look at this one case real quick.

(Pause in proceedings)

THE COURT: Yeah. I don't know what the shoulder is, but it seems like it would be the outside edge of it, to me anyway, and -- so I'm going to suppress it.

MR. HATTER: Thank you, Your Honor.

THE COURT: Both the physical evidence and any statements made.

MR. HATTER: Thank you, Your Honor.

MR. MARTINDALE: Thank you, Your Honor.

THE COURT: So --

MR. HATTER: Judge, at this time, may my client be released from custody?

THE COURT: He may.

MR. HATTER: Thank you, Judge.

(End of proceedings)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS     )
                       )
COUNTY OF POTTER       )

I, Jana Smith, Official Court Reporter in and for the 108th District Court of Potter County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 5th day of June, 2015.

*Jana Smith*
_____
Jana Smith, Texas CSR 3179
Expiration Date:  12/31/15
Official Court Reporter
108th District Court
Potter County, Texas
Amarillo, Texas  79101